**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| HIGHMARK INC., | ) | |
| | ) | Case No. _____ |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BROMEDICON, LLC and HALOMD, | ) | |
| LLC, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Highmark Inc. ("Plaintiff" or "Highmark"), by and through its undersigned counsel, hereby submits this Complaint against Defendants Bromedicon, LLC ("Bromedicon") and HaloMD, LLC ("HaloMD") (collectively, "Defendants") and in support thereof, alleges as follows:

## INTRODUCTION

1. Highmark brings this action to vacate hundreds of independent dispute resolution ("IDR") insurance payment determinations involving millions of dollars that Defendants Bromedicon and HaloMD procured through fraud, undue means, and misrepresentations of fact presented to certified IDR entities ("IDREs"), and that IDREs issued in excess of their authority over disputes that were never validly subject to the federal No Surprises Act ("NSA") IDR process. In addition, and in the alternative, Highmark asserts tort, statutory, and equitable claims for Defendants' independent misconduct, both because that intentional and fraudulent misconduct caused independent injuries to Highmark that are not duplicative of vacatur and because, if the

- 1 -

Court concludes (as it should) that some or all of the challenged disputes were inarbitrable from the outset or otherwise outside the NSA's judicial review framework, those claims provide an independent basis for relief.

2.    As set forth below, Defendants have weaponized the federal NSA, 42 U.S.C. § 300gg-111—a statute enacted to protect commercially insured patients from surprise out-of-network medical bills—by transforming the IDR process into a vehicle for fraud and financial gain. Defendants' scheme is not a good faith attempt to obtain fair reimbursement. It is a deliberate effort to wrongfully extract inflated payments from Highmark through, among other things: (i) the intentional and knowing submission of hundreds of categorically ineligible disputes, including disputes barred by the NSA's 90-day-cooling off period, and (ii) material misrepresentations to IDREs that the NSA's "blind," non-adversarial procedures prevented Highmark from identifying or meaningfully rebutting in real time.

3.    The NSA established the IDR process to resolve limited categories of surprise billing disputes between health plans and out-of-network providers, thereby protecting patients who unknowingly receive out-of-network care or require emergency service from being saddled with excessive balance bills reflecting the gap between a provider's charges and the plan's reimbursement. The IDR process is strictly limited to "qualified IDR items or services" that satisfy defined eligibility criteria, including, among other requirements, that no prior IDR determination has been issued for the same items or services between the same provider and payor within the preceding 90 calendar days (the "90-day cooling off period").

4.    In repeated knowing and intentional violation of this eligibility requirement, Defendants have engaged in a pattern of obtaining IDR payment determinations for particular procedure codes and then, ***often the same day or the very next day***, initiating new IDR disputes

against Highmark involving those identical codes. Defendants do so with full knowledge that such disputes are ineligible for the IDR process under the 90-day cooling-off period.

5.        Moreover, Highmark has obtained IDR submission packages from certain IDREs and, ***for the first time***, discovered that Defendants made material misrepresentations in their "blind" IDR submissions. Highmark could not have identified these misstatements during the IDR process because the NSA requires a "blind" proceeding in which each party submits its final offer and supporting materials without the right or ability to see the opposing party's submission. These misrepresentations include, among others: (a) the selective citation of misleading, cherry-picked reimbursement data from other health plans—***not Highmark***—and from different time periods and geographic regions in purported support of the qualifying payment amount ("QPA"); and (b) false representations to IDREs that Highmark failed to engage in negotiations regarding in-network rates, including the submission of ***supposed correspondence that Highmark never received***. In fact, Highmark did engage in communications aimed at establishing reasonable in-network reimbursement rates and contractual agreements with Bromedicon. Despite those efforts, Bromedicon failed to engage in meaningful dialogue regarding reimbursement terms and network participation, frustrating the parties' ability to reach an agreement and undermining the collaborative negotiation process contemplated by the NSA. Defendants advanced these misrepresentations to mislead IDREs and secure inflated payment determinations, many of which were not eligible for IDR in the first place.

6.        As a direct and proximate result of Defendants' fraudulent conduct, Highmark has suffered and continues to suffer substantial damages, including improper IDR payment determinations, administrative and IDRE fees, and the diversion of significant resources to address ineligible and fraudulently submitted IDR disputes. While abuse of the IDR process by providers

and their billing agents has been well documented and has added at least $5 billion to overall health system costs since its inception, Defendants' fraud goes further, threatening the affordability and sustainability of health care coverage for Highmark's members and the self-insured employer groups—including public school districts, state and local governmental entities, and labor unions—whose benefits Highmark administers across Pennsylvania and nationwide.[1]

7.     Highmark brings this action to put an end to Defendants' exploitation of the IDR process and their deliberate scheme to defraud Highmark through false eligibility attestations and intentional misrepresentations, which Highmark was unable to discover or challenge during the IDR proceedings themselves.

## PARTIES

8.     Plaintiff Highmark is a not-for-profit health plan and professional health services plan corporation which operates and has its principal place of business in Allegheny County, Pennsylvania.

9.     Defendant Bromedicon is a Delaware limited liability company that provides neuromonitoring services to members of health plans administered by Highmark. Bromedicon maintains its principal place of business in West Conshohocken, Pennsylvania, and regularly transacts business in the Commonwealth of Pennsylvania. Upon information and belief, Bromedicon is a subsidiary of Medsurant Health, an affiliate of MPOWERHealth Practice Management, LLC ("MPOWERHealth").[2]

---

[1] *See* Jack Hoadley, Kennah Watts, Katie Keith, & Ellie DeGarmo, *The No Surprises Act IDR Process: An Early Look At 2025 Data*, HEALTH AFFAIRS (Mar. 20, 2026), https://www.healthaffairs.org/content/forefront/no-surprises-act-idr-process-early-look-2025-data.

[2] *See* https://medsuranthealth.com/about-medsurant/our-practices.html (last visited Apr. 15, 2026). Upon information and belief, MPOWERHealth operates and/or controls a network of provider entities that furnish out-of-network services, including Bromedicon.

10.      Defendant HaloMD is a Delaware limited liability company with a principal place of business in Addison, Texas. HaloMD is a third-party billing and dispute-resolution company that administers open negotiations and IDR proceedings on behalf of out-of-network healthcare providers, including Bromedicon. Upon information and belief, HaloMD is owned and controlled by Alla LaRoque, its founder and President. Alla LaRoque is married to Scott LaRoque, the founder and Chief Executive Officer of MPOWERHealth,[3] who also holds ownership interests in HaloMD through affiliated entities.[4] Although founded only in 2022, HaloMD has rapidly become one of the largest participants in—and, as alleged herein, one of the most prolific abusers of—the federal NSA IDR process. Public analyses of data published by the Centers for Medicare & Medicaid Services ("CMS"), the federal agency responsible for administering and reporting on the IDR program, identify HaloMD as one of the largest initiating parties in the federal IDR system, responsible for approximately 10% of all disputes initiated during Q2 2024 and ranking among the highest-volume filers nationwide.

11.      Upon information and belief, Bromedicon retained HaloMD to engage in the NSA's open negotiation process, initiate IDRs, and otherwise pursue payment disputes against Highmark on Bromedicon's behalf. In doing so, HaloMD acted as Bromedicon's agent and co-conspirator in the fraudulent scheme alleged herein.

---

[3] Alla LaRoque sits on the board of MPOWERHealth and previously served as MPOWERHealth's Chief Operating Officer. *See* https://mpowerhealth.com/board-members/#.

[4] According to filings with the Texas Secretary of State, HaloMD has two members. The first member of HaloMD is LFF Holdings Groups Ltd Co ("LFF"). LFF is a Texas limited liability company with Scott LaRoque as its sole member. The second member of HaloMD is Scalla Investments, L.L.C. ("Scalla Investments"). Scalla Investments is a Texas limited liability company with Scott LaRoque and Alla LaRoque as its sole members.

## JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Count I arises under the NSA, which expressly provides for judicial review of IDR payment determinations in the limited circumstances set forth in Section 10(a) of the Federal Arbitration Act ("FAA"). *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) (incorporating 9 U.S.C. § 10(a)(1)–(4)). The NSA further provides that IDR payment determinations "shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim." *Id.* § 300gg-111(c)(5)(E)(i)(I).]

13.     Highmark seeks vacatur of the IDR payment determinations specified in Exhibit A[5] on the grounds that Defendants procured them through fraudulent claims, misrepresentations of facts, fraud, and undue means, and/or because the IDREs exceeded their authority by issuing determinations over disputes that were not validly subject to the NSA IDR process.

14.     This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over Highmark's related tort, statutory, declaratory, and equitable claims because those claims arise from the same transactions and occurrences as Count I, including the same IDR submissions, challenged determinations, alleged misrepresentations, payments, administrative fees, and course of conduct.

15.     Highmark pleads its tort, statutory, declaratory, and equitable claims in addition to, and in the alternative to, Count I. These claims arise from Defendants' independent misconduct—

---

[5] The IDR payment determinations for which Highmark currently seeks vacatur are identified in Exhibit A based on Highmark's reasonable pre-suit investigation and information presently available to it. Because the challenged IDR submissions and determinations involve a high volume of records and information uniquely within Defendants' possession or control, Highmark continues to review the relevant data and reserves the right to supplement, amend, or conform Exhibit A and its requested relief to the evidence developed through discovery, expert analysis, and further investigation.

including fraud and related torts—through which Defendants intentionally submitted disputes they knew to be ineligible for the NSA IDR process, supported by false eligibility attestations, sham correspondence, and material misrepresentations in "blind" submissions to IDREs. These claims are pleaded in addition to Count I because they seek redress for distinct injuries. They are pleaded in the alternative because, if the Court determines that some or all of the challenged disputes were categorically ineligible for the NSA IDR process, were inarbitrable from the outset, or otherwise fall outside the NSA's judicial-review provision, then the NSA does not bar Highmark from pursuing independent tort, statutory, declaratory, and equitable remedies for Defendants' misconduct and for determinations that were never valid, binding NSA IDR determinations in the first place.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (i) a substantial part of the events or omissions giving rise to the claims occurred in, and were directed toward, this District; and (ii) Highmark is headquartered in this District and has suffered injury here.

## FACTUAL BACKGROUND

### I.    Highmark Is a Community-Focused Health Plan

17.    Highmark is a nonprofit organization that operates as a Blue Cross Blue Shield licensee in Pennsylvania, Delaware, New York, and West Virginia, serving over seven million people. Highmark offers a broad range of high-quality, accessible and affordable health plans – including individual, employer-sponsored, Medicare, and Medicaid options – with an emphasis on providing affordable rates for members, including those with low incomes or who have difficulty getting insurance. As a regional, nonprofit payor, Highmark is community-driven and often seeks

strategic partnerships with its largest providers to improve the health and well-being of its members and their communities.

18.     A significant portion of Highmark's business is administrative services only ("ASO"), where Highmark acts as a third-party administrator for self-insured groups and has obligations to pursue recovery of overpayments to providers. These self-insured groups include state and local government entities, public school districts, labor unions, and mid-sized to large private employers, all of which bear the full cost of healthcare claims and immediately absorb the impact of any increase in provider rates. The remainder of Highmark's commercial enrollment is fully-insured business where Highmark is responsible for payment of healthcare costs and managing the risk for a pool of insureds. For this business, insured individuals are impacted by increased care costs in the form of higher health insurance premiums and cost-sharing amounts.

## II.     The No Surprises Act and the IDR Process

19.     Effective January 1, 2022, the NSA banned surprise billing for three categories of out-of-network care: (1) emergency services; (2) non-emergency services at in-network facilities; and (3) air ambulance services. *See* 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135. Congress enacted the NSA with a clear purpose: to protect patients from unexpected and often financially devastating medical bills while establishing an independent system to resolve payment disputes in a manner that is "fair to both providers and plans that also does not increase aggregate healthcare system costs."[6] *See* Ban Surprise Billing Act, H.R. Rep. No. 116-615 (2020), at 47, 52–53. Congress recognized that certain out-of-network providers held "substantial market power" and

---

[6] *See also* Lawson Mansell & Sage Mehta, *New data shows No Surprises Act arbitration is growing healthcare waste*, NISKANEN CENTER (June 18, 2025), https://www.niskanencenter.org/new-data-shows-no-surprises-act-arbitration-is-growing-healthcare-waste/; *Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act*, Issue Brief No. HP-2021-24, Off. of the Ass't Sec'y for Planning & Evaluation, U.S. Dep't of Health & Human Servs. (Nov. 22, 2021), http://resource.nlm.nih.gov/9918539088506676.

"face[d] highly inelastic demands for their services because patients lack[ed] the ability to meaningfully choose or refuse care," enabling such providers to "charge amounts for their services that . . . result[] in compensation far above what is needed to sustain their practice." *Id.* at 53. Congress further understood that patients, particularly in emergency or facility-based settings, are often unable to avoid or even anticipate out-of-network care, leaving them uniquely vulnerable to these practices. *Id.* Congress noted that this "market failure" was having "devastating financial impacts on Americans and their ability to afford needed health care." *Id.* at 52-53.

20.     When a health plan like Highmark receives a claim for out-of-network services subject to the NSA, the health plan makes an initial payment or issues a notice of denial of payment within 30 days. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I). If the provider is dissatisfied with the initial payment, the provider or its designee may initiate open negotiations with the health plan by providing formal written notice within 30 business days of the initial payment or notice of denial. 42 U.S.C. § 300gg-111(c)(1)(A).

21.     After initiating open negotiations, the provider must attempt in good faith to negotiate a resolution with the health plan over a 30-business-day open negotiations period. If the open negotiations do not result in a determination of an amount of payment, the provider may then initiate the IDR process within four business days. *See* 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(b)(2)(i).

22.     The IDR process is only available for a "qualified IDR item or service" that meets strict statutory and regulatory criteria. To be eligible, the following conditions must, among others, be satisfied: (a) the underlying services fall within the NSA's scope; (b) the services involve a patient with health care coverage subject to the NSA; (c) no specified state surprise billing law applies; (d) the underlying services were covered by the patient's health benefit plan; (e) the patient

did not waive the NSA's balance billing protections; (f) the provider initiated and exhausted open negotiations; (g) the provider initiated IDR within 4 business days after open negotiations were exhausted; and (h) the provider has not had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days. 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(a)(2)(xi), (b)(2).

### III.    The 90-Day Cooling-Off Period

23.    The requirement that a provider not have had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days — commonly referred to as the "90-day cooling-off period" — is a critical gatekeeping provision of the NSA.

24.    The 90-day cooling-off period ensures that the IDR process is used for the bona fide resolution of discrete billing disputes rather than as a mechanism for providers to serially relitigate rate determinations by flooding the system with duplicative disputes. Congress enacted this provision to incentivize health care providers and payors to resolve their differences amongst themselves, consistent with the NSA's purpose of creating a streamlined process.

25.    Under 45 C.F.R. § 149.510(c)(3)(i), following an IDR determination involving a particular provider and a particular health plan with respect to the same or similar item or service, neither party may submit a new IDR claim involving the same or similar item or service against the same party for 90 calendar days following the determination.

### IV.    The IDR Process Is a Blind Proceeding

26.    The NSA's IDR payment determination process resembles a baseball-style arbitration. The provider and health plan each submit an offer, and the IDRE selects one party's offer as the out-of-network rate. 42 U.S.C. § 300gg-111(c)(5)(B).

27.    In making its determination, the IDRE must consider the QPA—generally the plan's median in-network rate for the same service in the same geographic area—and several "additional circumstances," such as the training, experience, and quality of the provider, its market share, and the acuity of the patient. 42 U.S.C. § 300gg-111(c)(5)(C).

28.    The IDR process is a blind proceeding: each party submits its final offer and supporting evidence without the right or ability to see the other party's submission. There is no mechanism for discovery, cross-examination, or adversarial testing of the opposing party's representations to the IDRE.

29.    The blind nature of the process means that a party to an IDR proceeding has no ability during the proceeding itself to identify, challenge, or rebut misstatements or false evidence submitted by the opposing party in its IDR submission package. Nor does the statute or implementing regulations provide any right for a party to obtain or review the opposing party's submission during the proceeding. At most, a party may learn what the opposing side submitted only after the IDRE has already rendered its payment determination—and even then, only if the IDRE elects to share that information. As a result, any such disclosure is unusual, and discretionary rather than guaranteed, and in most cases a party may never obtain access to the materials on which the determination was based.

## V.    The IDR Portal Requires Attestations of Eligibility

30.    Parties must initiate the IDR process online through a federal "IDR Portal." The website for submissions is https://nsa-idr.cms.gov/paymentdisputes/s/. The portal is specifically designed to guide initiating parties through eligibility requirements and to prevent the submission of ineligible disputes.

31.     At the outset, before an initiating party can begin completing the Notice of IDR Initiation Form, the portal displays a prominent warning in a blue box stating: "*Disputing parties will generally have 4 business days from the conclusion of their open negotiation period to submit a Notice of IDR Initiation, unless the dispute qualifies for an exception, **such as the dispute being subject to the 90-day cooling off period**, the dispute having received prior approval for an extension, or a certified IDR entity has requested the party to resubmit the dispute.*" This warning alerts users to both timing requirements and potential disqualifying conditions, including the 90-day cooling off period.

> ℹ️ Disputing parties will generally have **4 business days** from the conclusion of their open negotiation period to submit a Notice of IDR Initiation, unless the dispute qualifies for an exception, such as the dispute being subject to the 90-day cooling off period, the dispute having received prior approval for an extension, or a certified IDR entity has requested the party to resubmit the dispute.
>
> **IMPORTANT:** The administrative fee is $115.00.
>
> **NOTE:** Once you complete the Notice of IDR Initiation, download a copy and send the Notice of IDR Initiation PDF to the Non-Initiating Party.
>
> **REMINDER:** You must complete and submit the form in a single session. For security reasons and protection of personal data, your session will time out after 60 minutes of inactivity.

32.     Before proceeding, the initiating party must agree to the portal's terms and conditions and complete a series of "Qualification Questions." The terms and conditions include a notice that the initiating party must submit an "**[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process.**"

Along with the general information you'll need to start your Federal IDR dispute process, provide:

- Information to identify the qualified IDR items or services (and whether they are designated as batched or bundled items or services)
- Dates and location of qualified IDR items or services
- Type of qualified IDR items or services such as emergency services and post-stabilization services
- Codes for corresponding service and place-of-service
- Attestation that qualified IDR items or services are within the scope of the Federal IDR process
- Your preferred certified IDR entity

33.      These questions are designed to assess whether the dispute meets the statutory and regulatory criteria for IDR eligibility. If the responses indicate that the dispute is ineligible—for example, because it falls within the 90-day cooling off period—the portal generates an alert and prevents the user from continuing.

34.      Even after agreeing to the terms and conditions, the first page of the Notice of IDR Initiation Form reiterates that disputes falling within the 90-day cooling off period are ineligible for IDR. Thus, the portal provides repeated, explicit notice of this limitation before any submission is completed.

ℹ Disputing parties will generally have **4 business days** from the conclusion of their open negotiation period to submit a Notice of IDR Initiation, unless the dispute qualifies for an exception, such as the dispute being subject to the 90-day cooling off period, the dispute having received prior approval for an extension, or a certified IDR entity has requested the party to resubmit the dispute.

IMPORTANT: The administrative fee is $115.00.

NOTE: Once you complete the Notice of IDR Initiation, download a copy and send the Notice of IDR Initiation PDF to the Non-Initiating Party.

REMINDER: You must complete and submit the form in a single session. For security reasons and protection of personal data, your session will time out after 60 minutes of inactivity.

35.     At the conclusion of this process, the submitting party must attest, via electronic signature, that the "**item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process**." A copy of the completed Notice of IDR Initiation, including this attestation, is then provided to the non-initiating party, the IDRE, and the federal Departments.

I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

*Initiating party (or representative of the initiating party):    *Date:

Print Name    04/16/2026

36.     At multiple stages throughout the portal workflow—from initial warnings, to qualification screening, to final attestation—the initiating party is required to acknowledge and affirm compliance with IDR eligibility requirements. By the time a dispute is submitted, the initiating party has been repeatedly notified of, and has affirmatively represented compliance with, the governing limitations of the IDR process.

37.     The notice and attestation requirements do not end with submission of a dispute. When an IDRE issues a payment determination, it provides the parties with a written decision that expressly reiterates the 90-day cooling-off period. Specifically, the IDRE notifies the initiating party that it may not submit a subsequent dispute involving the same or similar item or service against the same opposing party—here, Highmark—within 90 days. The determination further identifies the date on which the cooling off period expires, thereby providing clear, individualized guidance as to when a new dispute may be filed.

> The party that initiated the Federal IDR Process may not submit a subsequent Notice of IDR Initiation involving the same other party with respect to a claim for the same or similar item or service that was the subject of this dispute during the 90-calendar-day suspension period following the date of this email, also referred to as the "cooling off" period.
>
> If the initiating party was a provider, the provider is identified by the National Provider Identifier (NPI) or Taxpayer Identification Number (TIN). During the cooling off period, the provider may not submit a subsequent Notice of IDR Initiation involving the same non-initiating party with respect to a claim billed under the same NPI or TIN for the same or similar item or service.
>
> The initiating party with respect to dispute number DISP-1851702 was BROMEDICON, LLC. The initiating party's NPI is 1003321316 and TIN is 364875473. The non-initiating party was BCBS PA HIGHMARK. The 90-calendar day cooling off period begins on November 22, 2024 . Please retain this information for your records.

38.    These post-determination notices are clear and explicit. They leave no ambiguity as to the applicability or duration of the 90-day cooling-off period. Despite receiving these repeated, individualized warnings—including the precise date on which new disputes would become eligible—Defendants nevertheless submitted hundreds of disputes that fell within the prohibited 90-day period.

## VI.    Defendants' Fraudulent Scheme

### A.    Knowing and Intentional Violation of the 90-Day Cooling-Off Period

39.    Defendants have engaged in a deliberate and systematic scheme to exploit the IDR process by knowingly initiating IDR disputes that are ineligible under the NSA's 90-day cooling-off period.

40.    The NSA expressly prohibits providers from initiating IDR proceedings for the same item or service against the same payor within 90 days of a prior IDR determination. Each IDR determination provides explicit notice of this restriction, ensuring that providers and their representatives, like Defendants, are aware of the prohibition and the applicable timeframe before submitting additional disputes.

41. Despite this clear rule and repeated notice, Defendants routinely initiated new IDR disputes for the same procedure codes within the 90-day cooling-off period—often within days of receiving an IDR determination.

42. At the same time, Highmark was inundated with hundreds of IDR disputes involving multiple providers and procedure codes, while Defendants alone controlled the decision to initiate each dispute. Despite being in the unique position to refrain from submitting ineligible disputes, Defendants instead chose to engage in a pattern of serial, improper filings in violation of the NSA's requirements.

43. The IDR payment determinations for which Highmark currently seeks vacatur for Defendants' violation of the 90-day cooling off period are identified in **Exhibit B** based on Highmark's reasonable pre-suit investigation and information presently available to it.[7] By way of example, and without limitation, the following instances illustrate Defendants' repeated and knowing violations of the 90-day cooling-off requirement:

a. On July 2, 2024, Defendants obtained an IDR payment determination for procedure code 95937 (DISP-1111499), triggering a 90-day cooling-off period. The IDR determination, which was sent to the email address medsurantarbitrationnsa@halomd.com on behalf of Bromedicon, specifically stated that Bromedicon, as the initiating party in this dispute, could not submit a subsequent Notice of IDR Initiation involving Highmark with respect to a claim for the same or similar item or service that was the subject of the dispute. It further specified that the 90-calendar day cooling-off period begins on July 2, 2024. Despite this clear notice, **just two**

---

[7] Because the challenged IDR submissions and determinations involve a high volume of records and information uniquely within Defendants' possession or control, Highmark continues to review the relevant data and reserves the right to supplement, amend, or conform Exhibit B and its requested relief to the evidence developed through discovery, expert analysis, and further investigation.

**days later**, on July 4, 2024, Defendants initiated three more disputes for the identical procedure code: DISP-1503706, DISP-1503741, and DISP-1503794—each in knowing violation of the cooling-off period.

b.      The violations for procedure code 95937 continued to cascade over the ensuing months as additional determinations within the same cooling-off period restarted the 90-day clock and provided Defendants with repeated, individualized notice of the cooling-off restriction. On September 20, 2024, Defendants obtained another determination for procedure code 95937 (DISP-992261), again expressly notifying Defendants of the 90-day prohibition and restarting the cooling-off period. **Just three days later**, on September 23, 2024, Defendants initiated three more disputes for the same code: DISP-1825159, DISP-1825365, and DISP-1825758. On March 10, 2025, yet another determination was issued (DISP-2626809), and on **that very same day**—March 10, 2025—Defendants initiated another dispute (DISP-2732696), followed by an additional dispute **just two days later** on March 12, 2025 (DISP-2748772). On March 25, 2025, another determination was issued (DISP-2685240), and **the very next day**, March 26, 2025, Defendants filed yet another dispute (DISP-2845684). On April 8, 2025, a determination was issued (DISP-2109522), and **just two days later**, on April 10, 2025, Defendants initiated two more disputes: DISP-2974479 and DISP-2977484.

c.      Defendants' pattern of serial violations is further illustrated by their conduct with respect to procedure code 95941. On September 20, 2024, Defendants obtained an IDR payment determination for procedure code 95941 (DISP-1503693), triggering a 90-day cooling-off period. The IDR determination, which was sent to the email address medsurantarbitrationnsa@halomd.com on behalf of Bromedicon, specifically stated that Bromedicon, as the initiating party in this dispute, could not submit a subsequent Notice of IDR

Initiation involving Highmark with respect to a claim for the same or similar item or service that was the subject of the dispute. It further specified that the 90-calendar day cooling-off period begins on September 20, 2024. Despite this clear notice, Bromedicon, or HaloMD on behalf of and in coordination with Bromedicon, using the email address medsurantarbitrationnsa@halomd.com, initiated **just three days later**, on September 23, 2024, three additional IDR disputes for the identical procedure code: DISP-1825342, DISP-1826149, and DISP-1826545—each in knowing violation of the 90-day cooling-off period.

d.     The violations for procedure code 95941 continued to cascade as additional determinations within the same cooling-off period restarted the 90-day clock and provided Defendants with repeated, individualized notice of the cooling-off restriction. These determinations included, among others: DISP-1669943 (October 8, 2024), DISP-1733906 (October 17, 2024), DISP-1826149 (October 24, 2024), DISP-1826545 (October 25, 2024), and DISP-1761711 (November 23, 2024), DISP-2053083 (December 31, 2024).

e.     On January 14, 2025, Defendants obtained another determination for procedure code 95941 (DISP-2253787), again expressly notifying Defendants of the 90-day prohibition and restarting the cooling-off period. **Just one day later**, on January 15, 2025, Defendants initiated two more disputes for the same code: DISP-2419610 and DISP-2419708. On February 21, 2025, yet another determination was issued (DISP-2536968), again restarting the clock and providing express notice of the prohibition. **The very next day**, on February 22, 2025, Defendants initiated two more disputes (DISP-2626973 and DISP-2626984). On February 26, 2025, another determination was issued (DISP-2419708), and **just two days later**, on February 28, 2025, Defendants initiated three additional disputes: DISP-2670525, DISP-2671606, and DISP-2671621. On March 11, 2025, another determination was issued (DISP-2626984), and **one**

**day later**, on March 12, 2025, Defendants filed yet another dispute (DISP-2748620). On April 7, 2025, a determination was issued on that very dispute (DISP-2748620), and **just two days later**, on April 9, 2025, Defendants initiated another dispute (DISP-2956595).

f.      Defendants engaged in the same pattern with respect to procedure code 95938. On July 31, 2024, Defendants obtained an IDR payment determination (DISP-1503780), triggering a 90-day cooling-off period through at least October 29, 2024. The IDR determination was sent to the email address medsurantarbitrationnsa@halomd.com on behalf of Bromedicon and specifically stated that Bromedicon could not submit a subsequent Notice of IDR Initiation involving Highmark for the same or similar item or service. Despite receiving this determination, Defendants initiated another IDR dispute for the identical procedure code **on the very same day**—July 31, 2024 (DISP-1606356)—demonstrating a brazen disregard for the cooling-off restriction. This pattern repeated on April 8, 2025, when Defendants obtained another determination for the same code (DISP-2107396), and **the very next day**, on April 9, 2025, initiated two more disputes (DISP-2956579 and DISP-2957086), followed by another on April 10, 2025 (DISP-2973536)—**just two days** after the determination that expressly reiterated the prohibition.

g.      The same conduct occurred with procedure code 95939. On December 12, 2024, Defendants obtained an IDR payment determination (DISP-2024424), triggering a 90-day cooling-off period through at least March 12, 2025. The IDR determination was sent to the email address medsurantarbitrationnsa@halomd.com on behalf of Bromedicon and specifically stated that Bromedicon could not submit a subsequent Notice of IDR Initiation involving Highmark for the same or similar item or service. Despite this clear notice, **just one day later**, on December 13, 2024, Defendants initiated another dispute for the same code (DISP-2253796). The violations continued to cascade. On March 25, 2025, Defendants obtained another determination for

- 19 -

procedure code 95939 (DISP-2671618), restarting the cooling-off period and once again providing express notice of the 90-day prohibition. **The very next day**, March 26, 2025, Defendants initiated two more disputes (DISP-2847746 and DISP-2848395). On June 26, 2025, yet another determination was issued (DISP-3269945), and **the following day**, June 27, 2025, Defendants initiated another dispute (DISP-3514884), followed by two more on June 30, 2025 (DISP-3527850 and DISP-3529143)—**just four days after** the determination. As with procedure code 95941, each successive determination for procedure code 95939 restarted the cooling-off clock and provided Defendants with additional, individualized notice of the restriction, yet Defendants continued their pattern of serial violations without interruption.

h.      On January 2, 2025, Defendants obtained an IDR payment determination for procedure code 95868 (DISP-2253792), triggering a 90-day cooling-off period through at least April 2, 2025. The IDR determination was sent to the email address medsurantarbitrationnsa@halomd.com on behalf of Bromedicon and specifically stated that Bromedicon, as the initiating party, could not submit a subsequent Notice of IDR Initiation involving Highmark with respect to a claim for the same or similar item or service. It further specified that the 90-calendar day cooling-off period begins on January 2, 2025. Despite this clear notice, **just one day later**, on January 3, 2025, Bromedicon, or HaloMD on behalf of and in coordination with Bromedicon, using the email address medsurantarbitrationnsa@halomd.com, initiated another dispute for the identical procedure code (DISP-2356142).

44.     Defendants' pattern of initiating new IDR disputes after receiving an IDR award for the identical procedure code is not the product of inadvertence or mistake. The IDR Portal's Qualification Questions specifically inquire about prior IDR determinations and the applicable

- 20 -

cooling-off period. To submit these ineligible disputes, Defendants had to provide false information about prior determinations and falsely attest that the disputes were eligible for IDR.

45.     Defendants knew, at the time each such dispute was initiated, that an IDR determination had been made on the same services and involving the same payor—Highmark—within the preceding 90 calendar days. Bromedicon knew because it had been a party to the prior determination, and HaloMD knew because, upon information and belief, it served as Bromedicon's third-party biller and IDR administrator and prepared, transmitted, or caused to be transmitted both the prior and subsequent disputes.

46.     As a further indication of Defendants' knowing and intentional conduct, the sheer volume and timing of these filings demonstrate a calculated strategy to exploit the IDR system before Highmark or the IDREs can identify and object to the ineligibility of the disputes. The 90-day cooling-off period requires a health plan to cross-reference each newly initiated dispute against every prior IDR determination involving the same provider and the same procedure code, to determine whether the new dispute falls within a prior cooling-off window. Performing that analysis in real time is extraordinarily difficult—and, as a practical matter, not reasonably possible—given the volume of disputes Defendants file on top of the hundreds of disputes initiated each day by other out-of-network providers and their representatives across the country.

47.     During the first half of 2025 alone, disputing parties initiated more than 1.18 million disputes nationwide, and HaloMD alone was filing an average of nearly 1,262 disputes per day. Highmark receives only a Notice of IDR Initiation—not a flag identifying a potential cooling-off violation—and must identify any eligibility deficiency and raise formal objection within three business days.  Highmark performed more than reasonable diligence with respect to IDR disputes, but in real time could not perform a forensic-level, dispute-by-dispute reconciliation of thousands

- 21 -

of incoming IDR initiations each day against a rolling database of every prior determination, for every procedure code, for every provider, across every 90-day window.

48.     Highmark has now been able to reconstruct and trace Defendants' pattern of cooling-off violations as set forth in detail in this Complaint. But the fact that these violations are identifiable in hindsight does not mean they were reasonably detectable at the speed the IDR process demands.

49.     As a result, Highmark has been compelled to pay IDR awards on disputes that were ineligible for the IDR process in the first place—and to pay those awards at rates far exceeding the QPA that Congress expected would serve as the baseline in most IDR proceedings. In some instances, the awards Defendants obtained exceeded even the providers' own billed charges. Highmark has to date been stuck bearing the financial consequences of Defendants' fraud: bound by payment determinations that should never have been rendered, at prices inflated well beyond any measure of reasonable reimbursement.

50.     The IDR process has been overwhelmed by a staggering volume of disputes that far exceed the government's initial estimates. Before the IDR process launched, CMS estimated that parties would initiate about **17,000 IDR disputes** each year.[8] Providers have shattered those estimates. To say that out-of-network providers have filed more IDR cases than anticipated would be a gross understatement. In only **the first nine months** after the IDR system opened in 2022, about **190,000 disputes** were filed—***more than ten times*** the number expected for the first year alone. From 2022 to June 2025, more than 3.4 million disputes were filed.[9] And the number of

---

[8] *See Requirements Related to Surprise Billing; Part II*, 86 Fed. Reg. 55,980, 56,056 (Oct. 7, 2021), available at https://www.federalregister.gov/documents/2021/10/07/2021-21441/requirements-related-to-surprise-billing-part-ii.

[9] *See* Jack Hoadley, Kennah Watts, Katie Keith, & Ellie DeGarmo, *The No Surprises Act IDR Process: An Early Look At 2025 Data*, HEALTH AFFAIRS (Mar. 20, 2026), available at https://www.healthaffairs.org/content/forefront/no-surprises-act-idr-process-early-look-2025-data.

disputes is only continuing to increase: Even more recent bi-monthly updates from CMS show that nearly 1.4 million cases were filed from July 2025 through December 2025.[10] This has resulted in a whopping **4.8 million total cases** through the end of 2025.[11]

51.     In the second half of 2024, disputing parties—virtually all of whom are providers—initiated **853,374 disputes**, **40% more** than the first half of 2024 (610,498).[12] This figure from **six months** is more than **50 times** the volume of disputes the government originally anticipated for a **full year**. Similar to the last six months of 2024, the first half of 2025 "was characterized by an increasingly large volume of disputes submitted through the Federal IDR portal."[13] Disputing parties initiated **1,186,812 disputes**, **39% more** than the second half of 2024 (853,374 disputes), with providers or their representatives initiated the majority of disputes (**81%**).[14]

52.     Government reporting also shows that most disputes are initiated by a small number of providers and their representatives. The top ten initiating parties represented approximately 69% of all disputes initiated in the first six months of 2025, similar to the last six months of 2024 (71%), and the top three initiating parties accounted for about 44% of disputes.[15]

---

[10] *See* Federal IDR bi-monthly reports, https://www.cms.gov/nosurprises/policies-and-resources/Reports.

[11] *See* Jack Hoadley, Kennah Watts, Katie Keith, & Ellie DeGarmo, *The No Surprises Act IDR Process: An Early Look At 2025 Data*, HEALTH AFFAIRS (Mar. 20, 2026), available at https://www.healthaffairs.org/content/forefront/no-surprises-act-idr-process-early-look-2025-data.

[12] *Supplemental Background on the Federal IDR Public Use Files, July 1, 2024—Dec. 31, 2024* (as of May 28, 2025), available at https://www.cms.gov/files/document/federal-idr-supplemental-background-2024-q3-2024-q4.pdf.

[13] *Supplemental Background on the Federal IDR Public Use Files, January 1, 2025—June 30, 2025* (as of Jan. 21, 2026), available at https://www.cms.gov/files/document/federal-idr-supplemental-background-2025-q1-2025-q2.pdf.

[14] *Id.* at 2.

[15] *Id.*

53.     HaloMD ranks as the most frequent filer of IDR disputes among the top three initiating parties. During the first six months of 2025, HaloMD initiated **230,297 IDR disputes**,[16] accounting for **17%** of all disputes in the first quarter of 2025 and **22%** of all disputes in the second quarter of 2025—which by itself exceeded the government's original estimate for total annual disputes **more than thirteenfold**. That means HaloMD was initiating an average of nearly **1,262 disputes against health plans per day**. HaloMD won slightly less often but still prevailed in **87%** and **82%** of its disputes in the first two quarters of 2025, respectively.

54.     IDREs must process eligibility and payment issues within compressed timelines and often rely on the initiating party's representations in the Notice of IDR Initiation. Defendants exploited those procedures by submitting high volumes of disputes and repeatedly attesting to eligibility even where the 90-day cooling-off period barred the dispute.

55.     Government data confirms that providers prevail in the substantial majority of IDR payment determinations and that provider awards frequently exceed the QPA. In the most recent reporting period, providers prevailed in **88%** of IDR payment determinations, compared with 85% in 2024 and 81%, in 2023,[17] and the median amounts awarded routinely exceeded the QPA—including the median awards of approximately **920%** and **835%** of the QPA in HaloMD-initiated disputes in the first two quarters of 2025, respectively,[18] and a median award of approximately **2,862%** of the QPA for neurology procedures of the type that Bromedicon provides in the second

---

[16] *Federal IDR Supplemental Tables for 2025 Q1* (as of Jan. 21, 2026), available at https://www.cms.gov/files/document/federal-idr-supplemental-tables-2025-q1.xlsx; *Federal IDR Supplemental Tables for 2025 Q2* (as of Jan. 21, 2026), available at https://www.cms.gov/files/document/federal-idr-supplemental-tables-2025-q2.xlsx.

[17] *Supplemental Background on the Federal IDR Public Use Files, January 1, 2025—June 30, 2025* (as of Jan. 21, 2026) at 4, available at https://www.cms.gov/files/document/federal-idr-supplemental-background-2025-q1-2025-q2.pdf.

[18] *See* Jack Hoadley, Kennah Watts, Katie Keith, & Ellie DeGarmo, *The No Surprises Act IDR Process: An Early Look At 2025 Data*, HEALTH AFFAIRS (Mar. 20, 2026), https://www.healthaffairs.org/content/forefront/no-surprises-act-idr-process-early-look-2025-data.

quarter of 2025.[19] These volume and award patterns are alleged to provide context for the financial incentives that drove Defendants' misconduct and for the practical impossibility of detecting Defendants' misrepresentations and IDR ineligibility in real time.

### B. Misrepresentations in IDR Submissions Concealed from Highmark

56. In addition to Defendants' knowing violation of the 90-day cooling-off period, Highmark has recently obtained IDR submission packages from IDREs and discovered, for the first time, that Defendants made blatant and material misstatements in its IDR submissions—misstatements that were concealed from Highmark by the blind nature of the IDR process and that Highmark could not have discovered or challenged during the pendency of the IDR proceedings.

57. First, in multiple IDR submissions, Defendants presented purported evidence regarding the QPA that was not specific to the disputes at issue and was materially misleading. Rather than relying on data relevant to the Highmark plans, time periods, and geographic regions at issue, Defendants submitted reimbursement data derived from different payors and materially different geographic markets—often reflecting regions with known higher reimbursement rates. This approach contravenes the statutory requirement that the QPA be based on the median of the contracted rates actually recognized by the specific plan or issuer for the same or similar item or service, furnished by providers in the same or similar specialty and within the same geographic region—not rates paid by other payors or to unrelated providers. *See* 42 U.S.C. § 300gg-111(a)(3)(E). In addition, much of the data cited by Defendants (drawn from payors other than Highmark) predated the NSA and therefore could not reliably reflect post-NSA market conditions or QPA benchmarks.

---

[19] *See Federal IDR Supplemental Tables for 2025 Q2* (as of Jan. 21, 2026), available at https://www.cms.gov/files/document/federal-idr-supplemental-tables-2025-q2.xlsx.

58.    Defendants used this irrelevant and outdated data to create the false impression that Highmark's QPA was artificially low and that significantly higher reimbursement rates were warranted. By presenting non-comparable data as though it were representative of the applicable market and payor, Defendants misled IDREs into crediting inflated payment offers that were not supported by the facts of the underlying disputes.

59.    These same data points and purported comparators were used repeatedly across multiple IDR submissions. The repeated use of identical examples demonstrates that Defendants were not engaging in individualized, dispute-specific analysis, but instead were relying on standardized, pre-selected data designed to systematically skew IDR outcomes in their favor.

60.    Second, in multiple IDR submissions, Defendants falsely represented to the IDREs that Highmark failed to participate in discussions regarding in-network reimbursement rates. In reality, Highmark engaged (and continues to engage) in communications aimed at establishing reasonable in-network reimbursement rates and negotiating contractual arrangements with Bromedicon. These misrepresentations were material because they were intended to depict Highmark as unresponsive or unwilling to negotiate in good faith, thereby skewing the IDREs' payment determinations and assessments of the parties' conduct in Defendants' favor.

61.    In an effort to substantiate these misrepresentations, Defendants submitted to the IDREs a document styled as a "Request for In-Network Contract Rates" letter, which they claimed had been sent by Bromedicon (or HaloMD on its behalf) to demonstrate good-faith efforts to negotiate in-network rates. Highmark never received any such letter, because, on information and belief, Defendants never transmitted it.

62.    The sham nature of the letter is backed up by multiple indicia of inauthenticity on its face, including the use of generic placeholders—such as "Health Plan," "Provider," "IONM

Practice," and "Neurology Practice"—in place of actual party names, references to a health plan located in Texas rather than Highmark's service area in Pennsylvania, and incorrect or non-existent contact information for Bromedicon. Moreover, the letter is substantially similar in format, structure, and language to communications that Highmark has received from other out-of-network providers or their billing agents, further suggesting that the document is a repurposed template rather than a genuine communication authored by or on behalf of Bromedicon. These defects, together with the repeated use of identical template documents across multiple disputes, confirm that the letter was not a genuine communication, but rather a generic template—used by other providers or their agents—that Defendants repurposed and submitted as though it were an authentic record of Bromedicon's own, most recent outreach to Highmark.

---

**Subject: Request for In-Network Contract Rates**

Dear Health Plan,

Please accept this request on behalf of the "IONM Practice" an established and well-respected neurology practice specializing in intraoperative neuromonitoring located in state of Texas. As an out-of-network provider with Health Plan, "Health Plan", our IONM Practice has been providing vital intraoperative neurology services to numerous patients who are beneficiaries of your health plan. Our practice is known for its commitment to quality patient care, a high standard of professional ethics, and advanced clinical expertise.

Intraoperative neurologists play a critical role in surgical procedures, providing real-time monitoring of a patient's neurophysiological functions. This unique and advanced service requires a high level of training, expertise, and precision, thereby enhancing surgical outcomes and reducing potential complications. Due to these special skills and advanced nature of our work, intraoperative neurology services typically command a higher level of reimbursement.

Our practice, being dedicated to this specialized field, has invested heavily in equipment, training, and maintaining a highly qualified team, which are all reflected in the higher cost of services. Nevertheless, we are committed to providing these services because of the significant benefits they confer to patients, particularly in mitigating neurological risks during complex surgeries.

Given the significant role we play in enhancing patient safety during surgical procedures, we believe it is important to negotiate a contract with you as the health plan that accurately reflects the level of care and expertise we provide. By offering in-network services, we can ensure that our mutual patients receive the care they need at a reasonable cost, thereby increasing their access to these essential specialized services.

We are eager to discuss the possibility of transitioning to an in-network status with your health plan and negotiate a fair contract rate that takes into account the specialized nature of our services.

Please feel free to reach me directly at payor-contracting@mdms.com to arrange a suitable time for this discussion.
Thank you for considering our request. We look forward to your positive response.

Sincerely,

Neurology Practice

---

63.    In the actual email communications between Bromedicon and Highmark—which Defendants conspicuously did not submit to the IDREs—Bromedicon used entirely different language, formatting, and substance than what appears in the sham letter. At various times, Bromedicon communicated with Highmark by email regarding reimbursement and contracting matters, but the content of those emails bears no resemblance to the polished template letter that Defendants submitted to the IDREs as purported evidence of Bromedicon's outreach. Defendants possessed the real email communications and knew that they bore no resemblance to the sham letter, yet chose to submit the sham letter.

64.    Defendants' decision to submit a generic template letter with no apparent connection to the disputed claims—rather than the actual email communications between Bromedicon and Highmark in their possession—shows fraudulent intent. Defendants took an off-the-shelf template letter circulated among out-of-network providers and their billing agents, repurposed it as Bromedicon's own correspondence, and submitted it to the IDREs as genuine—knowing the blind IDR process would prevent Highmark from discovering Defendants' sham document and submitting to the IDRE the real email communications between the parties.

65.    Defendants submitted the sham letter and accompanying misrepresentations directly to the IDREs in their IDR submission packages, exploiting the blind nature of the IDR process with particular deliberateness. Because Defendants had participated in actual email communications with Highmark regarding reimbursement and contracting matters, Defendants knew that Highmark possessed the real records of those communications — records that would immediately expose the sham documents as false. Defendants submitted the sham materials precisely because they knew the blind process would prevent Highmark from seeing, identifying, or rebutting them before the IDREs relied upon them.

- 28 -

66.     In effect, Defendants exploited the procedural safeguards of the IDR process to perpetrate a fraud that could not have survived even the most basic adversarial scrutiny. Had the IDR process permitted even minimal adversarial review, the misrepresentation would have been immediately apparent: Highmark could have produced the actual email communications and demonstrated that the letter Defendants submitted was never sent and bore no resemblance to the parties' real correspondence.

67.     It was only after the IDR proceedings concluded and Highmark obtained the IDR packages that these misrepresentations came to light. These misrepresentations were not discoverable by Highmark upon the exercise of due diligence prior to or during the IDR proceedings because (a) the blind process prevented Highmark from viewing Defendants' submissions; (b) there is no discovery mechanism in IDR proceedings; (c) there is no procedure for cross-examination or adversarial challenge to the other party's submissions within the IDR process; and (d) the existence of real, but entirely dissimilar, email communications between the parties gave Highmark no basis to suspect that Defendants would manufacture fictitious documents purporting to reflect different communications that never occurred.

68.     The IDR payment determinations for which Highmark currently seeks vacatur for Defendants' misrepresentations in IDR submissions, which were concealed from Highmark, are identified in **Exhibit C** based on Highmark's reasonable pre-suit investigation and information presently available to it.[20] The following are exemplary instances in which Defendants made

---

[20] Given that every IDR submission package submitted by Defendants that Highmark has obtained thus far from the IDREs contained the same sham document and misleading QPA comparator information, Highmark believes discovery will show that most, if not all, IDRs initiated by Defendants contained these same misrepresentations, and therefore expects the number reflected in Exhibit C to increase. Accordingly, Highmark reserves the right to supplement, amend, or conform Exhibit C and its requested relief to the evidence developed through discovery, expert analysis, and further investigation.

material misrepresentations in IDR submissions that were concealed from Highmark during the IDR process and that were made to improperly influence the IDREs in Defendants' favor:

a.    **Sham "Request for In-Network Contract Rates" Letter and False Negotiation Narrative:** In the IDR proceedings captioned DISP-1851702 and DISP-3528869, Defendants' IDR submission packages included a document styled as a "Request for In-Network Contract Rates" letter, attached as "Exhibit 5," which Defendants represented had been sent by Bromedicon to Highmark as evidence of Bromedicon's good-faith efforts to negotiate in-network rates. Defendants also represented to the IDRE that Bromedicon had "extended a formal invitation to [Highmark] to enter into negotiations with the aim of establishing in-network rates and contractual agreements," but that Highmark had "not reciprocated [Bromedicon]'s good faith efforts." Defendants further directed the IDRE to "review [Bromedicon]'s written request for in-network reimbursement rates." These representations were false. The letter attached as Exhibit 5 was never received by Highmark. The document is a repurposed template—substantially similar in format, structure, and language to template communications Highmark has received from other out-of-network providers and/or their billing agents—and bears no resemblance to the actual email communications between Bromedicon and Highmark. The IDRE selected Defendants' offers, substantially exceeding the QPA, as the prevailing offers and found that "**the initiating party's evidence regarding the provider's good faith contract negotiations** and the provider's extensive experience **was the most persuasive**." These findings were based directly on the sham letter and false narrative that Defendants submitted. Highmark did not and could not have known of the sham document or the false representation during the IDR process because the blind submission procedure prevented Highmark from viewing Defendants' submission packages.

- 30 -

b.      In the IDR proceedings captioned DISP-2024426, DISP-3026241, and DISP-3060503, Defendants submitted the same sham "Request for In-Network Contract Rates" letter as "Exhibit 5" and falsely represented that Bromedicon had sought to negotiate in-network rates and that Highmark had not reciprocated. In choosing Defendants' inflated offers as the appropriate value for the services, the IDRE found that "**the initiating party's evidence regarding the provider's good faith efforts was the most persuasive**." And in DISP-3060503, the IDRE also found the sham letter and Highmark's supposed failure to reciprocate "**compelling** in substantiating that [Bromedicon]'s offer best reflects the appropriate payment amount for this claim."

c.      **Misleading QPA Data from Other Health Plans:** In the IDR proceeding captioned DISP-1851702, Defendants' IDR submission package also cited data and reimbursement information from other health plans—*not Highmark*—in purported support of the QPA. Defendants submitted explanation of benefit forms derived from other health plans and different geographic regions, including Texas and Ohio, often reflecting markets with materially higher reimbursement rates that bear no resemblance to the geographic area in which the services at issue were rendered. Some of the data also predated the NSA's effective date and therefore could not reliably reflect post-NSA market conditions or QPA benchmarks.

d.      Defendants presented this non-comparable information to the IDRE as though it were relevant to Highmark's QPA or otherwise probative of the appropriate out-of-network rate for services billed to Highmark's plans in the applicable geographic area and time period. This information was misleading and irrelevant. The QPA is a plan-specific calculation based on Highmark's own median contracted rates for the same or similar services in the same geographic region during the applicable time period. Data from different payors, different

geographic markets, and different time periods has no bearing on Highmark's QPA. By submitting reimbursement data from unrelated payors in non-comparable geographic markets and outdated time periods, Defendants sought to create the false impression that Highmark's QPA was artificially low and that a significantly higher payment was warranted. Highmark did not and could not have known of this misleading submission during the IDR process because the blind submission procedure prevented Highmark from viewing Defendants' submission package.

e.      Defendants submitted similar misleading and irrelevant reimbursement data from other payors – not Highmark – in support of their payment offers for many other disputes, including, among others: DISP-2024426 and DISP-3026241 (same data from Anthem and Blue Cross Blue Shield of Texas for services rendered provided by Texas providers between 2020 and 2022); DISP-3026243 (data from Blue Cross Blue Shield of Texas, Cigna, and Meritain Health for services rendered by Texas providers in 2022); and DISP-3721525 (Anthem for services rendered in 2019).

69.     Each of these misrepresentations was material because the NSA requires the IDRE to consider the QPA and additional circumstances in making its payment determination, and misrepresentations about the QPA and the parties' conduct during negotiations directly affected the IDRE's evaluation of the parties' competing offers.

### C.  HaloMD's Role and Incentives

70.     The relationship between Bromedicon and HaloMD was not that of independent entities engaged in ordinary vendor services. Rather, upon information and belief, Bromedicon and HaloMD acted in coordination and concert to generate, submit, and prosecute IDR disputes arising from Bromedicon's out-of-network claims.

71.     HaloMD markets itself as operating with an "exclusive focus on Independent Dispute Resolution (IDR)" and holds itself out as an expert in navigating the NSA's dispute-resolution framework.

72.     HaloMD's business model is built around maximizing reimbursement through the IDR process. HaloMD advertises that it achieves "industry leading results," including awards that are multiples higher than the QPA, and reports securing billions of dollars in IDR determinations annually.

73.     HaloMD is financially incentivized to increase both the size and volume of IDR awards. Upon information and belief, HaloMD charges its provider clients a contingency-based fee tied to the amounts recovered, aligning its financial interests with maximizing reimbursement rather than ensuring compliance with statutory requirements.

74.     Consistent with this incentive structure, HaloMD operates "at scale," using centralized and automated systems to initiate and prosecute IDR disputes in high volumes on behalf of affiliated providers. HaloMD touts its "proprietary platform" as one founded with "advanced technology" and "AI-driven" infrastructure. HaloMD also represents that it "instantly assesses each case for eligibility under The No Surprises Act and relevant state regulations." HaloMD further represents that it "gathers and organizes the necessary documentation [from the provider], [and] prepar[es] a compelling case that highlights the provider's position, ensuring nothing is overlooked[.]" Providers, like Bromedicon, submit services for dispute in the IDR process through HaloMD's portal.

75.     In a short period of time since its founding in 2022, HaloMD has become one of the largest participants in—and abusers of—the federal IDR process. The combination of contingency-based compensation, high-volume processing, and demonstrated disregard for

statutory requirements creates powerful incentives for HaloMD to submit as many IDR disputes as possible and to pursue the highest possible reimbursement amounts, including through disputes that do not satisfy the NSA's eligibility criteria.

76. As a result, HaloMD's financial interests are directly aligned with pursuing aggressive and improper IDR strategies on behalf of its provider clients—including Bromedicon—regardless of whether the underlying disputes are eligible, timely, or otherwise proper.

## VII. Defendants' Conduct Has Caused Substantial Harm to Highmark

77. As a direct and proximate result of Defendants' fraudulent conduct, Highmark has suffered injuries, including excessive payments procured through false attestations of eligibility and material misrepresentations in IDR submissions.

78. Highmark has also incurred substantial administrative and IDRE fees in connection with Defendants' ineligible disputes. Both parties to an IDR proceeding must pay a non-refundable administrative fee when a dispute is initiated. This fee is not recoverable even when the dispute is determined to be ineligible for IDR. Both parties must also pay an IDRE fee before the IDRE makes the payment determination.

79. Moreover, Highmark has been forced to divert significant internal resources and costs to process and respond to Defendants' ineligible and fraudulently procured IDR disputes, resources that would otherwise be devoted to serving Highmark's members and plan participants.

80. The financial harm caused by Defendants' fraudulent practices is ongoing and threatens the affordability and sustainability of health benefits for Highmark's members and ASO customers. This includes self-funded groups such as state and local governmental entities, public school districts, and labor unions—budget-constrained entities that rely on Highmark to manage costs, and whose exposure to inflated claims directly damages Highmark's business relationships

and competitive position. Excessive IDR awards drive up health care costs, which ultimately may result in higher premiums for consumers. The costs to employers and health plan members are inextricably linked to the reimbursement rates that health plans negotiate with each health care provider in their provider network. If left unchecked, Defendants' conduct will continue to deplete funds set aside for covering healthcare for citizens of Pennsylvania and nationwide, incentivize copy-cat behavior by other out-of-network providers, and make it more difficult for health plans like Highmark to build provider networks that help control the cost and quality of healthcare. Defendants' conduct also places providers who do the right thing—either by contracting with health plans and honoring the reimbursement rates they agreed to or by charging fair, market rates for out-of-network services—at a substantial competitive disadvantage.

## COUNT I
### VACATUR OF IDR PAYMENT DETERMINATIONS PROCURED BY FRAUD, UNDUE MEANS, AND MISREPRESENTATIONS OF FACT, AND ISSUED IN EXCESS OF IDRE AUTHORITY (42 U.S.C. § 300gg-111(c)(5)(E); 9 U.S.C. § 10(a)(1), (4))

81.    Highmark incorporates by reference all preceding paragraphs as though fully set forth herein.

82.    The NSA provides that a determination of a certified IDR entity under subparagraph (A) "(I) shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim," and "(II) shall not be subject to judicial review except in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9." 42 U.S.C. § 300gg-111(c)(5)(E)(i). Section 10(a) of the FAA permits vacatur where, among other things, an award was "procured by corruption, fraud, or undue means," 9 U.S.C. § 10(a)(1), or where "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," *id.* § 10(a)(4). Highmark invokes both the NSA's exception to

- 35 -

binding effect for fraudulent claims and misrepresentations of fact and the FAA vacatur grounds incorporated by 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).

83. Count I seeks vacatur of the IDR payment determinations identified in Exhibit A and the representative examples alleged above on three related grounds. First, the challenged determinations were issued in the absence of binding effect under the NSA because Defendants presented fraudulent claims or evidence of misrepresentations of facts to the IDREs. Second, the determinations were procured by fraud or undue means within the meaning of § 10(a)(1), including through sham negotiation materials, false negotiation narratives, and misleading reimbursement comparators concealed from Highmark by the blind IDR process. Third, the IDREs exceeded their powers within the meaning of § 10(a)(4) by issuing payment determinations on disputes that were not qualified IDR items or services.

84. Highmark did not know, and could not reasonably have known, of the concealed misrepresentations before or during the IDR proceedings. Highmark first uncovered the misleading submission materials only after obtaining IDR submission packages following the close of the proceedings, and it acted diligently thereafter to investigate the scope of the misconduct.

85. For the excess-of-authority ground, the challenged determinations identified in Exhibit A and the representative examples alleged above involving disputes submitted during an unexpired 90-day cooling-off period should be vacated under § 10(a)(4). The NSA authorizes IDR payment determinations only for qualified IDR items or services, and disputes barred by the 90-day cooling-off period are not qualified IDR items or services; by issuing payment determinations on those disputes, the IDREs exceeded their powers. Highmark pleads that § 10(a)(4) ground without waiving the alternative argument that threshold eligibility determinations on non-

qualified, inarbitrable disputes fall outside the NSA's judicial review provision and therefore do not preclude the alternative tort, statutory, declaratory, and equitable claims pleaded below.

86.     Under Count I, Highmark seeks an order vacating each IDR payment determination identified in Exhibit A and the representative examples alleged above, together with the amounts Highmark paid pursuant to those determinations and the associated administrative and IDRE fees.

## COUNT II
## FRAUD AND INTENTIONAL MISREPRESENTATION

87.     Highmark incorporates by reference all preceding paragraphs as though fully set forth herein.

88.     Highmark pleads this Count and the other tort, statutory, and equitable Counts that follow, in addition to, and in the alternative to, Count I. These Counts are pleaded in addition to Count I because Defendants' misconduct caused independent injuries, including but not limited to administrative and IDRE fees Highmark was forced to incur, harm caused by Defendants' submission of misleading evidence to IDREs, and the diversion of Highmark's personnel and resources to detect, investigate, and respond to Defendants' conduct. These Counts are pleaded in the alternative to Count I because, if the Court concludes that some or all of the challenged disputes were categorically ineligible for the NSA IDR process, were inarbitrable from the outset, or otherwise were not governed by the NSA's judicial-review provision, then the challenged determinations are not binding NSA IDR determinations, the NSA does not bar these Counts, and Highmark is entitled to pursue full tort, statutory, restitutionary, and equitable relief for Defendants' misconduct.

89.     As set forth above, Defendants knowingly and intentionally made false representations of material fact to Highmark, the IDREs, and the federal Departments in

connection with their initiation of and participation in the IDR process. These false representations include, but are not limited to:

      a.     Falsely attesting that items and services submitted to the IDR process were "qualified item(s) and/or service(s) within the scope of the Federal IDR process" when Defendants knew that the items and services were ineligible, including due to the NSA's 90-day cooling-off period;

      b.     Providing false and misleading information on the federal IDR Portal, including inaccurate responses to the Qualification Questions regarding prior IDR determinations, in order to bypass safeguards designed to prevent the submission of ineligible disputes;

      c.     Submitting reimbursement data and purported comparators derived from other health plans—not Highmark—and from non-comparable geographic regions and time periods, including pre-NSA data, in purported support of the QPA and payment offers, thereby misleading IDREs as to the appropriate basis for the payment determination; and

      d.     Falsely representing to IDREs that Highmark failed to engage in dialogue regarding in-network reimbursement rates.

90.     Defendants made each of these representations with knowledge of their falsity. With respect to the 90-day cooling-off period violations, Bromedicon was a party to the prior IDR determinations that rendered the subsequent disputes ineligible, and HaloMD, acting on behalf of and in concert with Bromedicon, prepared, transmitted, or caused to be transmitted the subsequent disputes. With respect to the misrepresentations in IDR submissions, Defendants knew or recklessly disregarded that the reimbursement data cited was from other providers and other health plans, and that Highmark had in fact engaged in good faith discussions aimed at establishing reasonable in-network reimbursement rates and contractual agreements with Bromedicon.

91.     Defendants made these false representations with the intent that Highmark, the IDREs, and the Departments rely upon them, for the purpose of obtaining money from Highmark through IDR payment determinations that Defendants knew were based on ineligible disputes and materially misleading submissions. To the extent Defendants' misrepresentations were made directly to the IDREs rather than to Highmark, Defendants specifically intended that Highmark rely upon those misrepresentations. Defendants knew that Highmark was the payor that would be bound by and compelled to pay any IDR payment determination procured through their false submissions. Defendants further knew that the blind nature of the IDR process would prevent Highmark from discovering or challenging their misstatements. Highmark was thus the foreseeable and specifically intended victim of Defendants' misrepresentations to the IDREs.

92.     Highmark reasonably, foreseeably, and justifiably relied on Defendants' false representations. With respect to the false eligibility attestations, once Defendants initiated the IDR process, Highmark was compelled to participate and respond within the NSA's compressed timelines. In many instances, the sheer volume of Defendants' ineligible filings—layered on top of the hundreds of IDR disputes initiated daily by other out-of-network providers—made it practically impossible for Highmark to identify every cooling-off violation in the three business days permitted for raising eligibility objections. Tracking the 90-day cooling-off period requires cross-referencing each new dispute against every prior determination for the same procedure code, same provider, and same payor across a rolling 90-day window—a forensic-level undertaking that no health plan could reasonably be expected to perform in real time at the scale and speed the IDR process demands. Highmark necessarily relied on Defendants' portal attestations that each dispute satisfied the NSA's eligibility requirements.

93.     Only with the benefit of time and forensic analysis has Highmark been able to reconstruct the full scope of Defendants' cooling-off violations. As a consequence, Highmark has been compelled to pay IDR awards on disputes that were ineligible for the IDR process in the first instance—at rates far exceeding the QPA and, in some cases, exceeding even the providers' own billed charges. With respect to the misrepresentations in IDR submissions, Highmark could not have discovered these misrepresentations during the IDR process because the blind submission process precluded Highmark from viewing Defendants' submission packages. Highmark's reliance was therefore justified because it had no opportunity to challenge or rebut these concealed misstatements.

94.     As a direct and proximate result of Defendants' fraud, Highmark has suffered substantial damages, including, but not limited to: (a) payments on IDR payment determinations that were procured through ineligible disputes and material misrepresentations; (b) non-refundable administrative and IDRE fees associated with ineligible IDR disputes; and (c) expenditure of internal resources to process and respond to Defendants' fraudulent submissions.

95.     Defendants' fraud was deliberate, systematic, and willful, warranting an award of punitive damages.

**COUNT III**
**NEGLIGENT MISREPRESENTATION**

96.     Highmark incorporates by reference all preceding paragraphs as though fully set forth herein.

97.     Highmark pleads this Count in addition to, and in the alternative to, Count I, and on the same bases set forth in paragraph 87 above.

98.     In submitting false attestations of eligibility and making material misrepresentations in its IDR submissions, Defendants misrepresented material facts to Highmark,

the IDREs, and the Departments regarding the eligibility and merits of the disputes it submitted to the IDR process.

99.     Based on the plain text of the NSA and its implementing regulations, the information available to Defendants through the IDR Portal's Qualification Questions, Defendants' own records of prior IDR determinations, and Highmark's communications during open negotiations, Defendants had no reasonable grounds on which to believe or represent that the disputes were eligible for IDR or that the factual representations in the submissions were accurate.

100.    Defendants made these misrepresentations in the course of their business and in a transaction in which they had a pecuniary interest, intending that Highmark, the IDREs, and the Departments rely upon them.

101.    Highmark reasonably, foreseeably, and justifiably relied on Defendants' misrepresentations for the reasons set forth above, including that the blind nature of the IDR process precluded Highmark from discovering the misstatements in Defendants' submissions until after the proceedings concluded.

102.    As a direct and proximate result of Defendants' negligent misrepresentations, Highmark has suffered substantial damages as set forth above.

## COUNT IV
## CIVIL CONSPIRACY

103.    Highmark incorporates by reference all preceding paragraphs as though fully set forth herein.

104.    Highmark pleads this Count in addition to, and in the alternative to, Count I, and on the same bases set forth in paragraph 87 above.

105.    Defendants knowingly agreed, combined, and acted in concert to carry out the fraudulent scheme described herein, including in connection with engaging in open negotiations,

initiating ineligible IDR disputes, preparing and submitting materially false IDR submission packages, and collecting the resulting proceeds.

106.    This conspiracy is further supported by HaloMD's role as Bromedicon's third-party biller and IDR representative and by the broader affiliations and familial ties between HaloMD and MPOWERHealth, including overlapping leadership, shared business infrastructure, and the marriage of HaloMD's founder and president, Alla LaRoque, to MPOWERHealth's founder and chief executive officer, Scott LaRoque. Upon information and belief, Bromedicon is affiliated with, owned by, controlled by, or operating in concert with MPOWERHealth. Each participant in this conspiracy shared the common objective of defrauding Highmark by exploiting the IDR process through false eligibility attestations and materially misleading IDR submissions, and each committed overt acts in furtherance of the conspiracy, including the submission of false attestations, the preparation and filing of misleading IDR submission packages, the pursuit of open negotiations based on false premises, and the collection of improper IDR awards.

107.    As a direct and proximate result of this conspiracy, Highmark has suffered substantial damages as set forth above.

## COUNT V
## UNJUST ENRICHMENT

108.    Highmark incorporates by reference all preceding paragraphs as though fully set forth herein.

109.    Highmark pleads this Count in addition to, and in the alternative to, Count I, and on the same bases set forth in paragraph 87 above.

110.    Defendants have been unjustly enriched by receiving IDR payment determinations and associated payments from Highmark for disputes that were ineligible for the IDR process under the 90-day cooling-off period and that were procured through material misrepresentations

in Defendants' IDR submissions. Bromedicon was enriched by the resulting awards and payments, and HaloMD was enriched by commissions, fees, or other compensation tied to those awards.

111.    Highmark conferred a benefit upon Defendants by making payments in compliance with IDR determinations that were the product of Defendants' fraud and misrepresentation. Defendants appreciated and knowingly accepted such benefit.

112.    Under the circumstances, it would be inequitable and unjust for Defendants to retain the payments and related compensation obtained through their fraudulent conduct.

113.    Highmark is entitled to restitution of all amounts improperly obtained by Defendants through the fraudulent conduct described herein.

114.

**COUNT VI**
**DECLARATORY AND INJUNCTIVE RELIEF**
**UNDER 28 U.S.C. §§ 2201–2202 AND ANCILLARY EQUITABLE PRINCIPLES**

115.    Highmark incorporates by reference all preceding paragraphs as though fully set forth herein.

116.    Highmark pleads this Count in addition to, and in the alternative to, Count I. It is pleaded in addition to Count I to the extent it provides declaratory and ancillary equitable relief that is not duplicative of the vacatur sought in Count I. It is pleaded in the alternative to Count I because, if the Court determines that some or all of the challenged disputes were categorically ineligible for the NSA IDR process, were inarbitrable from the outset, or otherwise were not governed by the NSA's judicial-review provision, then the challenged determinations identified in Exhibit A are not binding NSA IDR determinations and Defendants may not enforce, collect, or retain payment based on them.

117.    An actual and justiciable controversy exists between Highmark and Defendants concerning whether Defendants may enforce or retain payments or other amounts obtained through the challenged IDR determinations identified in Exhibit A, where those determinations were procured through fraudulent claims, misrepresentations of fact, fraud, undue means, and/or were issued in disputes that were not validly subject to the NSA IDR process.

118.    The Declaratory Judgment Act authorizes declaratory relief for controversies otherwise within the Court's subject-matter jurisdiction.

119.    In the alternative to vacatur under Count I, Highmark seeks a declaration that the challenged determinations identified in Exhibit A are not binding, are not payable, and may not be enforced against Highmark to the extent the Court determines that those disputes were not validly subject to the NSA IDR process or that the NSA's judicial-review provision does not govern those eligibility or inarbitrability determinations.

120.    Highmark further seeks targeted injunctive relief prohibiting Defendants from enforcing, collecting, retaining, or attempting to collect amounts awarded in the challenged determinations identified in Exhibit A, and from initiating or pursuing IDR proceedings against Highmark for claims that fall within the same objectively verifiable ineligibility categories identified in Exhibit A, including claims barred by the NSA's 90-day cooling-off period.

121.    Highmark does not seek through this Count a generalized injunction requiring Defendants to comply with the NSA, nor does it seek an advisory declaration governing unidentified future IDR proceedings. The relief sought in this Count is limited to the challenged determinations identified in Exhibit A and objectively verifiable categories of ineligible claims arising from the same course of conduct.

**PRAYER FOR RELIEF**

**WHEREFORE,** Highmark respectfully requests that this Court enter judgment against Defendants and award Highmark the following relief:

a.      An order vacating, pursuant to 42 U.S.C. § 300gg-111(c)(5)(E) and 9 U.S.C. § 10(a)(1) and (4), each IDR payment determination identified in Exhibit A and the representative examples alleged above, together with all amounts paid pursuant to those determinations and the associated administrative and IDRE fees;

b.      In addition to, and in the alternative to, the vacatur relief requested above, and to the extent not duplicative of that relief, compensatory damages in an amount to be determined at trial, including all improper IDR payments, administrative fees, IDRE fees, fabricated-evidence damages, and other costs attributable to Defendants' fraudulent conduct;

c.      Punitive damages in an amount sufficient to deter Defendants and others from engaging in similar fraudulent conduct;

d.      Restitution and disgorgement of all amounts improperly obtained by Defendants through the fraudulent conduct described herein;

e.      A declaratory judgment and injunctive relief as set forth in Count VI;

f.      Pre-judgment and post-judgment interest; and

g.      Such other and further relief as this Court deems just and proper.

- 45 -

## JURY TRIAL DEMANDED

Highmark hereby demands a trial by jury on all claims and issues so triable.

Dated: June 1, 2026                     Respectfully submitted,

**REED SMITH LLP**

By: *William J. Sheridan*
    William J. Sheridan
    Reed Smith Centre
    225 Fifth Avenue
    Pittsburgh, PA 15222
    Telephone: (412) 288-7282
    Facsimile:  (412) 288-3063
    wsheridan@reedsmith.com

    Mark E. Bini (*pro hac vice forthcoming*)
    Kaela Dahan (*pro hac vice forthcoming*)
    599 Lexington Avenue
    New York, NY 10022
    Telephone: (212) 521-5400
    Facsimile:  (212) 521-5450
    mbini@reedsmith.com
    kdahan@reedsmith.com

    Anthony R. Todd (*pro hac vice forthcoming*)
    10 South Wacker Drive
    Chicago, IL 60606
    Telephone: (312) 207-1000
    Facsimile:  (312) 207-6400
    atodd@reedsmith.com

    **Counsel for Plaintiff Highmark Inc.**